# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-1001V

|  |  |
|---|---|
| LEYSA STOTELMYER, | Chief Special Master Corcoran |
| Petitioner, |  |
| v. | Filed: August 25, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Robin J. Marzella, R.J. Marzella & Associates, P.C., Harrisburg, PA,* for Petitioner.

*Irene Angelica Firippis, U.S. Department of Justice, Washington, DC,* for Respondent.

## ENTITLEMENT DECISION[1]

On June 30, 2023, Leysa Stotelmyer filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, which was causally related to a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine which she received on July 9, 2020. Petition (ECF No. 1). Petitioner has not preponderantly established that her post-vaccination injury persisted for at least six months, as required under Section 11(c)(1)(D)(i). Therefore, she is not entitled to damages under any causation theory, and her claim must be dismissed.

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.    Procedural History

The Petition recognized that after attending one primary care appointment roughly three months post-vaccination, Ms. Stotelmyer deferred formal medical treatment for her shoulder for over two years. But she alleged an ongoing injury attributable to the vaccination throughout that gap. Petition at ¶¶ 6-9. The claim was assigned to the Office of Special Masters' Special Processing Unit ("SPU") in November 2023. ECF No. 13.

After Petitioner filed pertinent outstanding records,[3] Respondent filed his Rule 4(c) Report formally arguing (among other things) that Petitioner could not preponderantly establish the severity requirement. Rule 4(c) Report (ECF No. 22).[4] On August 22, 2024, Petitioner was ordered to show cause why her claim should not be dismissed for that reason. Show Cause Order (ECF No. 23). The parties completed the evidentiary record and briefing. Petitioner's Exhibits 8-11 and Response (hereinafter "Brief") filed Oct. 21, 2024 (ECF Nos. 24-27); Respondent's Response filed Dec. 2, 2024 (ECF No. 28); Reply filed Jan. 17, 2025 (ECF No. 30). The claim is ripe for adjudication.

## II.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

---

[3] The document numbering from Petitioner's Exhibit 1 begins at "006," and Respondent has requested that Petitioner "file the complete records… including but not limited to pages 001 – 005." Rule 4(c) Report at n. 2. But the custodian certified to providing 349 pages of medical records – corresponding exactly to what has been filed. *See* Ex. 1 at 6 (ECF No. 1-4 at 2). Thus, it appears that Petitioner has already filed the complete records obtained from this provider, and the numbering issue is harmless error. This Decision will continue to utilize numbering actually displayed in the exhibit for uniformity.

[4] Respondent also argued – in the event that Petitioner could overcome the threshold severity issue – that Petitioner could not preponderantly establish the fact of shoulder pain beginning within 48 hours after the June 2020 vaccination. Rule 4(c) Report at 6 – 8.

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

A potential petitioner must demonstrate that he or she "suffered the residual effects or complications of such [vaccine-related] illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." Section 11(c)(1)(D)(i)[5]; *see also*

---

[5] Section 11(c)(1)(D) presents two alternative grounds for eligibility to compensation if a petitioner does not meet the six months threshold: (ii) death from the vaccine, and (iii) inpatient hospitalization and surgical intervention. Neither alternative is alleged or implicated in this claim.

*Black v. Sec'y of Health & Human Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a *prima facie* case, but clear a jurisdictional threshold, by "submitting supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted).

A petitioner's discharge from formal medical care does not necessarily establish the complete resolution of an injury, with no residual effects. *See, e.g., Silacci v. Sec'y of Health & Hum. Servs.*, No. 21-1265V, 2024 WL 5295093, at *4 (Fed. Cl. Spec. Mstr. Dec. 5, 2024), citing *Herren v. Sec'y of Health & Hum. Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

However, Congress has stated that the severity requirement was designed "to limit the availability of the compensation system to those individuals who are *seriously injured* from taking a vaccine." H.R. REP. 100-391(I), at 699 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–373 (emphasis added), cited in *Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011), *cert. denied,* 132 S. Ct. 1908 (2012); *see also Wright v. Sec'y of Health & Human Servs.*, 22 F.4th 999, 1002 (Fed. Cir. 2022).

## III.    Evidence[6]

### A. Medical Records

Petitioner was a 65-year-old retiree at the time of vaccination. Ex. 1 at 309. Her medical history included hypertension, migraines, low back and lower extremity pain. Ex. 1 at 291, 309; *see generally* Ex. 5. She fell onto her left wrist and was assessed with a sprain in August 2019. Ex. 3 at 3. She had no prior history of left *shoulder* pain or dysfunction, however.

Petitioner received periodic vaccinations and evaluation at an established primary care practice. *See generally* Exs. 1, 3. The primary care records also reflect that Petitioner was able to telephone and electronically message her providers about any concerns, *see, e.g.*, Ex. 1 at 265–70, 289, 311. She also had an established chiropractor, who she last saw in January-March 2020. *See generally* Ex. 5.

---

[6] While I have not specifically addressed every medical record, or all arguments presented in the parties' briefs, I have fully considered all records as well as arguments presented by both parties.

On July 9, 2020, Petitioner received the at-issue Tdap vaccine in her left deltoid (in addition to a Prevnar-13 vaccine in her right deltoid) during a Medicare wellness exam at her primary care practice. It was planned that Petitioner would return in the fall for her physical. Ex. 1 at 40, 309–10.

The next medical record (for any reason) is from 92 days post-vaccination, on October 9, 2020, when Petitioner returned to the primary care practice, where she was seen by a resident Jared M. Roberts, M.D., and attending physician Karl T. Clebak, M.D. Ex. 1 at 339. Petitioner reported that "around the time" of, and "since" her Tdap vaccine, she has been experiencing left upper arm pain and weakness, which was positionally dependent – particularly with reaching overhead and behind her back – and "mild but shooting when it does occur." *Id.* at 338.

The physical examination did not document ROM findings. Petitioner's shoulder was not tender on palpation, but it had 4+/5 strength on abduction, and empty can and internal impingement tests reproduced pain. Ex. 1 at 339. The findings were "suggestive of rotator cuff injury (partial tear vs. tendinopathy vs. AC impingement)." *Id.* The primary care providers felt that the injury could be managed conservatively with physical therapy, and they gave "a printout containing exercises from the American Academy of Orthopedic Surgeons" to Petitioner, who was motivated to try the exercises on her own, noting that "the pain and weakness is not significantly limiting." *Id.* The plan also included non-steroidal anti-inflammatory medications ("NSAIDs") (noting that Petitioner had Meloxicam "on-hand"), ice, and heat as needed. *Id.*

Petitioner did not have **any documented left shoulder complaints, evaluation, or treatment over the next twenty-four (24) months – despite over ten medical encounters for other issues.** Those included:

- Chiropractic adjustments to address complaints of sacrum and buttock pain on December 31, 2020 (Ex. 5 at 33-34) and on January 4, 2021 (*id.* at 35).

- On January 18, 2021, a gynecologist notified Petitioner about recent lab results and scheduled her for a minor surgical procedure, which took place two weeks later.  Ex. 1 at 252-60, 230-41.

- Petitioner received a zoster vaccine on February 12th, and two COVID vaccine doses on March 13 and April 14, 2021 (according to later records, not indicating situs). *Id.* at 41-42.

- On September 27, 2021, she underwent cataract surgery. Ex. 6 at 34-35.

- On November 9, 2021, she had an in-patient evaluation of acute right buttock and leg pain. She mentioned undertaking an airplane flight to Florida two weeks earlier, but the primary care physician, Todd M. Felix, M.D., ruled out deep vein thrombosis ("DVT"). He instead assessed a gluteal muscle strain which could be managed conservatively with over-the-counter pain medications, compresses, and stretches. Ex. 1 at 110–12.

- On November 19, 2021, Petitioner received a COVID-19 booster vaccine (again, according to later records not indicating situs). Ex. 1 at 41.

- At a March 23, 2022 annual physical with primary care provider ("PCP") Angelica Yamada, M.D., Petitioner discussed her chronic gastroesophageal reflux disease, for which she received a new prescription. Ex. 1 at 140. She also discussed a history of atopic dermatitis or psoriasis ("a derm was not sure what it was"). The PCP observed a "small erythematous scaly patch on [Petitioner's] left upper back," and recommended continued use of the topical steroid clobetasol. *Id.* at 140-41. There are no recorded complaints, exam findings, diagnosis, or treatment relating to Petitioner's left shoulder within this annual exam record – and on a "mandatory intake pain" screening, her answer was 0/10. *Id.* at 156.

- Petitioner and the same PCP met for a telehealth appointment concerning recent abdominal pain and diarrhea on April 25, 2022, and exchanged follow-up messages on May 9, 2022. Ex. 1 at 59-62, 73.

- On June 23, 2022 at an urgent care facility, Petitioner complained of atypical chest pain (distinct from her chronic reflux). A physical exam was also conducted, with no recorded findings at the left shoulder. An EKG was unremarkable, but she apparently underwent further evaluation at a nearby hospital. Ex. 7 at 6-7.[7]

- At a July 13, 2022 follow-up appointment, the PCP reviewed that an "extensive cardiac evaluation" at the hospital had ruled out cardiac issues. Ex. 1 at 205. Petitioner's chest pain had resolved, she reported feeling well, and a physical exam found "no tenderness to palpation of sternum." *Id.* The PCP also reviewed that Petitioner had been treated for a urinary tract infection and gastroenteritis. *Id.* at 204.

---

[7] Records from the referenced June 23-24, 2022 emergency encounter(s) have not been filed.

After all of the above encounters for unrelated concerns, Petitioner underwent one orthopedic evaluation on October 5, 2022, for a "major proble[m]" of "left shoulder pain." Ex. 2 at 2. The orthopedist's record does not include any further history of the left shoulder pain – but an x-ray report from that same day listed "no known injury." *Id.* at 6. The x-ray found no pathology within the shoulder, but "extensive facet joint arthropathy throughout the visualized portion of the cervical spine." *Id.*[8] On exam, the orthopedist observed: "Left shoulder abduction and external rotation 80 [degrees] with positive impingement… no obvious rotator cuff tear noted." *Id.* at 3. The orthopedist recorded that Petitioner's "major problem today is left shoulder impingement," for which he administered a subacromial steroid injection. *Id.* at 4.[9] Petitioner has not filed any further orthopedic records.

Nearly six months later, on March 27, 2023, Petitioner saw her PCP Dr. Yamada for a Medicare annual wellness exam. Ex. 1 at 10. In addition to gastrointestinal issues, Petitioner complained of: "[C]hronic hx of left shoulder pain which she feels like started after she got a Tdap in her left arm. The pain is intermittent and does not really affect her daily function. She wants to know if Tdap could be the cause of her shoulder pain… She has been evaluated for this previously and even saw ortho who thought she had a bursitis and had given her [a] steroid injection, however reports that she did not get any improvement in her pain with this." *Id.* On exam, her left shoulder had no tenderness to palpation, normal ROM; and negative lift-off and empty can tests, but positive Kennedy-Hawkins and Neer's tests. *Id.* at 11. The PCP assessed "possible shoulder impingement" that could be addressed through a "trial of conservative management with PT." *Id.* But "the pain [was] not limiting and is minimal, therefore she [Petitioner] decline[d] further evaluation and treatment at [that] time." *Id.*[10]

Five months later, on October 2, 2023, Petitioner followed up with her PCP. Ex. 8 at 7. Petitioner complained of left shoulder/upper arm pain present "since getting the Tdap booster in 2020" and "chronic." She mentioned that her recent steroid injection had not helped her symptoms, but ice and Aleve had. *Id.* Petitioner also reported an "acute worsening of this pain" upon waking up four days earlier. *Id.* Petitioner denied any inciting injury, but she also described "frequent[ly]" carrying her seven-month-old granddaughter. *Id.* An exam found tenderness along the lateral arm; acute tenderness on palpation along the left triceps including insertion at the humerus; normal shoulder ROM; and negative

---

[8] Petitioner never underwent an MRI.

[9] On October 5, 2022, the orthopedist also evaluated Petitioner's right hand pain – but he did not offer any corresponding diagnosis or treatment. Ex. 2 at 2-5.

[10] Petitioner's counsel began requesting certified copies of her medical records on April 27, 2023, in connection with this Vaccine Program claim filed on June 30, 2023. Response at n. 4, citing ECF No. 11-1 at 1.

Kennedy-Hawkins, Neer's, Speed's and Yergason tests. *Id.* The PCP assessed that the exam findings were consistent with a left triceps strain, appropriate for conservative management with PT, RICE, and NSAIDs. *Id.*

On October 19, 2023, Petitioner attended her PT initial evaluation. Ex. 9 at 7. The history of present illness provides: "[P]atient received tdap vaccine in July 2020. Following the vaccine, pt… lost use of her L arm for several weeks… She was unable to reach and lift arm above 90 degrees… She received cortisone injection ~6 months ago and did not have improvement in pain." *Id.* Her pain ranged from 2-8/10. *Id.* On exam, the shoulder's active ROM was within normal limits except for internal rotation of 10 degrees (with normal being 90 degrees). *Id.* at 7-8. Empty can and Hawkins-Kennedy impingement tests aggravated her symptoms. *Id.* at 8. Strength was generally 3+/5. *Id.* The PT records list a diagnosis of a left triceps strain, warranting formal therapy twice a week for four weeks. *Id.*

Petitioner attended six formal PT sessions over the next month. Ex. 9 at 15-34. At the last session on November 27, 2023, she voluntarily discharged due to a plateau in progress and good understanding of her home exercise program. *Id.* at 33-34.

On January 5, 2024, Petitioner received a respiratory syncytial virus vaccine in her at-issue left arm, and a flu vaccine in her right arm. Ex. 8 at 18. No additional medical records have been filed.

### B. Affidavits

Petitioner maintains that the July 2020 vaccination caused "immense pain and extremely limited mobility," but that she "resisted immediately visiting [her] doctor both in the hope and presumption that the pain would dissipate on its own, and more importantly, due to the raging COVID-19 Pandemic," which was especially dangerous for people over 65 years old such as herself. Ex. 4 at ¶ 3.

Petitioner initially alleged that at October 2020 PCP evaluation, she "chose to do at-home workouts in lieu of [formal, in-person] physical therapy to minimize travel outside of the home as much as possible due to the COVID-19 Pandemic." Ex. 4 at ¶ 4. But in her supplemental affidavit prepared in October 2024 (after the severity issue was raised), Petitioner stated that in October 2020, the primary care doctor(s) had dismissed her concerns of a vaccine injury and inaccurately characterized the pain and weakness as "mild." Ex. 10 at ¶¶ 3-4.

Petitioner also described "attempt[ing] the at-home workouts provided, but notic[ing] little difference. The worst of the pain subsided after about one year [e.g., in summer 2021], which improved the pain in the aforementioned movements from debilitating to painful to tolerable." Ex. 4 at ¶ 5.

Petitioner represents that she left the house "only when necessary, which included only necessary medical appointments," even after being vaccinated against COVID-19 in spring 2021, due to ongoing caution related to her age. Ex. 10 at ¶ 7. She did not report ongoing shoulder pain during other medical appointments focused on more specialized or more pressing issues, or she did not feel that she would be taken seriously. *Id.* at ¶¶ 8-14.

Petitioner recalled that in summer 2022 (approximately two years after the at-issue vaccination, she experienced "worsen[ed]" and "flare[d] up" shoulder pain. Ex. 4 at ¶ 6; Ex. 10 at ¶ 16. She reiterated that over four years, her pain has "ebbed and waned, but never dissipated," with no injuries other than the vaccine. Ex. 10 at ¶¶ 26-29.

In affidavits submitted in October 2024 (Exs. 11-12), Petitioner's husband as well as her daughter (who lives one mile away) recalled that over the past four years, they had consistently observed Petitioner exhibiting left shoulder pain and weakness with no apparent alternative causes. The witnesses recall that Petitioner self-managed the injury with at-home exercises, ice and heat, and over-the-counter pain medications. They contend that Petitioner mainly kept her pain "at bay" by not using her left arm, and that the family continued to avoid COVID-19 (citing the daughter's high-risk job as a counselor/caseworker at the county prison). *See, e.g.*, Ex. 12 at ¶¶ 7, 9. They recall Petitioner deciding to reattempt formal treatment of her shoulder when the injury worsened in late summer or fall 2022, and again after her granddaughter's birth in February 2023. Ex. 11 at ¶¶ 15, 22; Ex. 12 at ¶¶ 12, 15.

## IV. Analysis

Petitioner has not preponderantly established a left shoulder injury or residual effects persisting for over six months after her July 9, 2020 vaccination. Section 11(c)(1)(D)(i).

I recognize that the vaccination, and the October 2020 primary care encounter, occurred during the Pandemic's first year. That context may partially explain Petitioner's 92-day initial treatment delay, and her related decision to attempt a home exercise

regimen rather than formal in-person PT.[11] But it is also relevant that Petitioner herself characterized the injury as positionally dependent, mild when it did occur, and not significantly limiting. The PCP's objective examination and assessment also suggested a not particularly severe injury. Ex. 1 at 338-39. Such information affirmatively recorded within medical records is presumed to be accurate. *Cucuras*, 993 F.2d at 1528. The record before me does not contain "consistent, clear, cogent, and compelling" evidence that this characterization of an initially mild injury was inaccurate – regardless of its cause in the views of treaters,

Even accepting Petitioner's explanation that she felt somewhat "dismiss[ed]" by treater(s) at the October 2020 evaluation, she nevertheless received a specific treatment plan *for a shoulder injury* (irrespective of what her treater(s) felt was the cause: vaccine-induced inflammation versus a rotator cuff tear). There is no apparent reason why persistent shoulder pain could not have been reported or documented in the subsequent two years, especially considering that Petitioner returned to the same primary care practice – and various other providers – during that time.

Moreover, an ongoing shoulder injury was neither reported by Petitioner or observed by any medical provider despite over ten in-person evaluations (and additional opportunities to report the injury – by secure messages and telehealth encounters). Some of the in-person encounters were focused on other areas of the body (e.g., cataract surgery), but several other encounters represented at least reasonable opportunities to have any ongoing shoulder injury documented. *See, e.g.*, Ex. 5 at 33-35 (December 2020 and January 2021 chiropractic adjustments); Ex. 1 at 110-12 (November 2021 primary care evaluation for buttock and hip pain); *id.* at 140-41 (March 2022 primary care annual evaluation, including examination of the left upper back – but no documentation of a shoulder injury, and reflecting a pain rating of 0/10); *id.* at 204-05 (July 2022 primary care appointment including palpation of the sternum, with no findings at the shoulder). While Petitioner has offered various explanations for her failure to report the injury at various appointments (in her affidavits and briefing), the overall lack of documentation of an ongoing shoulder injury has cumulative weight.

Petitioner's additional treatment records from 2022-23 describe a "flare-up" in pain. But The Table provides that SIRVA is characterized by an inflammatory reaction within the shoulder, without explaining *how long* that inflammatory response or its residual

---

[11] A 92-day initial treatment delay (especially with the backdrop of the early Pandemic, and with no intervening medical encounters for other concerns) would probably not prevent a finding of onset of shoulder pain within 48 hours after vaccination – but the delay is still relevant to understanding the injury's initial severity (and delay bears on damages even in cases where it does not defeat a SIRVA element).

effects will necessarily last. 42 C.F.R. § 100.3(c)(10) at Preamble. SIRVA is not necessarily a chronic condition – and a severity finding will always depend on the case-specific evidence. Many past cases comparable to the present have distinguished between an initial vaccine injury and complaints months or years later in time.[12] And in Ms. Stotelmeyer's case, treating providers noted the findings of cervical spine pathology, Ex. 2 at 6, and that she had been frequently lifting her young grandchild (born 31 months after the vaccination) prompting concern for a labral tear. Ex. 8 at 7.

Petitioner has not overcome the contemporaneous medical record evidence suggesting the absence of a vaccine injury persisting for at least six months. First, Petitioner conceded that her injury became "tolerable" over time. While she places this change in her condition at about one-year post-vaccination e.g., mid-2021, that recollection remains vague and not tied to any other events in her life. *See* Ex. 4 at ¶ 5; Ex. 10 at ¶ 14. And Respondent argues that the supplemental affidavits from Petitioner, her husband, and her daughter were prepared for the purpose of litigation, over four years after the subject vaccination, and should therefore be given less weight. Response at 9 (citing *Kohl v. Sec'y of Health & Hum. Servs.*, No. 16-0748V, 2022 WL 4127217 at *24 (Fed. Cl. Spec. Mstr. Aug. 18, 2022) ("Reports made much later and for litigation purposes are generally afforded little weight") (internal citations omitted); *Reusser v. Sec'y of Health & Hum. Servs.*, 28 Fed. Cl. 516, 523 (1993) (holding that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight).

All of the above reasons taken together prevent a finding that Petitioner suffered a shoulder injury or residual effects for at least six months that are attributable to her July 2020 vaccine. And this finding is fatal to the entire claim. For severity is a requirement that *all* Vaccine Act cases must satisfy – and therefore this is not a matter appropriately transferred from SPU for evaluation of a non-Table claim.

---

[12] *See, e.g., Francis v. Sec'y of Health & Hum. Servs.*, No. 20-0780V, 2023 WL 146481, at *5 (Fed. Cl. Spec. Mstr. Dec. 5, 2022) ("The lengthy gaps in the record reasonably allow for the possibility that *other* intervening issues or factors caused the later symptoms and reports of right shoulder pain in May of 2019, despite Petitioner's later references to her [October 2017] vaccination."); *Schutte v. Sec'y of Health & Hum. Servs.*, No. 21-0411V, 2024 WL 3250279, at *5 (Fed. Cl. Spec. Mstr. May 29, 2024) (involving a shoulder treatment gap starting three months post-vaccination, followed by the Pandemic, numerous medical appointments for other issues, and "the possibility of other intervening factors as more likely explanatory of Petitioner's subsequent shoulder complaints"); *Ramirez v. Sec'y of Health & Hum. Servs.*, No. 21-0344V, 2023 WL 4297848, at *6 (Fed. Cl. Spec. Mstr. Aug. 16, 2024) (evidencing an initially mild injury, followed by a "course of conduct reveal[ing] a patient willing to seek treatment for actual concerns – and one who easily could have also sought treatment for a shoulder issue had she been experiencing symptoms at the time); *Crittenden v. Sec'y of Health & Hum. Servs.*, No. 21-0215V, 2024 WL 5261958, at *9-10 (Fed. Cl. Spec. Mstr. Nov. 21, 2024) (featuring a claimant's description of "intermittent pain… allowing for the conclusion that the pain and symptoms could have a different source or explanation"; and "giv[ing] less weight to Pandemic impacts after the second half of 2020 – especially where… the claimant was… vaccinated in that later timeframe").

## Conclusion

Petitioner has not established the statutory severity requirement. Therefore, she is ineligible to pursue compensation under the Program. In the absence of a timely-filed motion for either reconsideration or review (see Appendix B to the Rules of the Court), the Clerk shall enter judgment in accordance with this Decision.[13]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[13] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.